UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DAVE NAGY,

          Plaintiff,

   v.

GROUP LONG TERM DISABILITY PLAN
FOR EMPLOYEES OF ORACLE
AMERICA, INC., et al.,

        Defendants.

Case No.  14-cv-00038-HSG

**ORDER**

Plaintiff Dave Nagy appeals the denial of disability benefits under an ERISA plan.  *See* Dkt. No. 1; Dkt. No. 46 ("Nagy Br."); Dkt. No. 44 ("Hartford Br.").  The Court held a bench trial on April 13, 2015, and the parties submitted supplemental briefing on April 17, 2015; April 27, 2015; June 19, 2015; June 29, 2015; and November 9, 2015.  Dkt. Nos. 65, 66, 69, 72, 73, 77, 78, 86, 87.  The Court has carefully considered the arguments and evidence presented by the parties and, for the reasons set forth below, OVERTURNS Hartford's denial of Long Term Disability ("LTD") benefits.  The following constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a).

## I.    FACTUAL BACKGROUND

### A.    The Long Term Disability Plan

This lawsuit stems from Hartford's denial of LTD benefits under the Group LTD Insurance Policy No. GLT-395175 (the "Policy") issued by Hartford to Oracle of America, Inc. ("Oracle"). AR 2449-2501.  "Total Disability" under the Policy means "during the Elimination Period and for the next 24 month(s), as a result of injury or sickness, You are unable to perform with reasonable continuity the Essential Duties necessary to pursue Your occupation in the usual or customary way."  AR 2473.  "Your Occupation" is defined, in pertinent part, as "any employment, business,

trade or profession and the substantial and material acts of the occupation You were regularly performing for Your employer when the disability began."  AR 2470.  After 24 months of benefits, the definition of disability changes to an "any occupation" standard, whereby an employee must show that he or she is "unable to engage with reasonable continuity in Any Occupation."  *Id*.  "Any Occupation" is defined as "an occupation You could reasonably be expected to perform satisfactorily in light of Your age, education, training, experience, station in life, and physical and mental capacity."  AR 2470.

### B.    Procedural History

Nagy was employed by Oracle as a software engineer, an occupation requiring only sedentary-level exertion, beginning on August 30, 1999.  He stopped working on September 13, 2011, due to various symptoms of chronic fatigue syndrome ("CFS") and potentially autonomic dysfunction and mental health issues.  AR 156-57.  Nagy submitted a short-term disability ("STD") claim that month, claiming that he was disabled as of September 8, 2011, and Oracle denied the claim.  AR 199.   Oracle's determination was reversed on appeal by the California Unemployment Insurance Appeals Board.  Dkt. No. 47-7, Declaration of Lawrence Padway, Ex. 7.  Thereafter, Nagy was paid STD benefits through September 2012.  AR 2410.  Nagy applied to Hartford for LTD benefits on November 30, 2012, and Hartford denied the application on January 16, 2013.  AR 58-65.  Nagy appealed that denial on July 16, 2013, AR 1879-80, and Hartford upheld the denial on November 15, 2013, AR 39-43.  Nagy filed this action challenging Hartford's decision on January 3, 2014.  Dkt. No. 1.

### C.    Nagy's Medical Records

#### 1.    Nagy's Medical Issues While at Oracle

Nagy asserts that he is disabled because of a "cluster of symptoms" that presented in October of 2006 after he returned from a trip to Hawaii.  Nagy Br. at 13.  These symptoms consist primarily of lightheadedness, ringing in the ears, fatigue, hyperhidrosis (excessive sweating), gastrointestinal problems, post-exertional malaise, and abnormal eye movement.  *Id.*  Nagy represents that, "[w]hile there has been some fluctuation over time, there is not much change between then and now."  *Id.*  The only symptoms Nagy suggests worsened at the time he stopped

working at Oracle in September of 2011 are "profuse sweating in the am, particular after taking a shower, and some cold intolerance in the late afternoon." *Id.* at 14 (citing AR 140).

These symptoms have been treated by a number of physicians over the last nine years. His primary care physician, Eena Duggal, M.D., referred Nagy to Paul Cameron Zei, M.D. in early 2008, who in turn referred him to Jose Montoya, M.D., a doctor with a clinical focus in CFS, AR 247. On June 4, 2008, Nagy had an initial consultation with Dr. Montoya. AR 2028-29. Dr. Montoya's "final impression" after that consultation was a diagnosis of CFS, which was likely viral in origin. AR 2029. Dr. Montoya saw Nagy again on July 25, 2008, and reported that Nagy "continues to perform at very low levels for physical and cognitive abilities and comes accompanied to the visit by his wife who confirms the clear downturn that he has had." AR 2032. Dr. Montoya further noted that the effects on Nagy's "social, occupational activities in the recent past have been even more severe." *Id.* Dr. Montoya's "final impressions" at the end of this visit were "[CFS], postural orthostatic tachycardia syndrome [and] likely Chlamydia." *Id.* On October 8, 2008, Dr. Montoya proposed antiviral therapy. AR 2040. On March 26, 2009, Dr. Montoya noted that Nagy had started the antiviral acyclovir and "is apparently feeling better." Nagy reported a 30% improvement in his dizziness and that he "does not have so much of the bad spells that he used to have since the initiation of acyclovir." AR 2049; *see also* AR 2085 (characterizing the improvement as between 25% to 30%).

Dr. Montoya next saw Nagy six months later in September of 2009. AR 2058. In his summary of that visit, Dr. Montoya repeated that Nagy felt 30% better after starting acyclovir and that the "[i]nitial improvement consisted of much less lightheadedness (no serious events any more)," and noted that Nagy had "no incapacitating symptoms anymore." *Id.* However, these benefits plateaued very early in the antiviral treatment schedule, and Nagy noticed no additional benefits after February of 2009. *Id.* Dr. Montoya's summary of his December 4, 2009, visit with Nagy is virtually identical to the September visit, with the exception of two unexplained percentages at the end of the summary reading: "His physical: 90%" and "Cognitive: 70%." AR 2072. Dr. Montoya's May 5, 2010, summary is again substantively identical to the previous two visits, but this time "His physical" is 75% and "Cognitive" is 60%. AR 2075. However, the

United States District Court
Northern District of California

summary of Nagy's November 5, 2010, visit is slightly different.  While Dr. Montoya noted the 30% improvement and the plateau after February 2009, he also reported that Nagy is "[n]ow working full time (not missing any days at work).  He used to miss several days at work.  Not anylonger [sic]."  AR 2079.  The "His physical" and "Cognitive" percentages remained at 75% and 60%, respectively.

On June 23, 2011, Nagy saw Paul Cameron Zei, M.D. at the request of his primary care physician, Eena Duggal, M.D.  AR 2087-86.  Dr. Zei wrote that, while Nagy reported "dizziness more or less every day all the time[,]" he was also "walking about 9 miles per weekend," although the exercise "usually knocks him out for several days afterwards."  AR 2085.  On August 2, 2011, Nagy was seen by Michael P. McQuillen, M.D., who wrote that Nagy reported "a sense of lightheadedness with ringing in his ears" but did not comment on the severity of his symptoms or on Nagy's ability to work.  AR 2092.  Dr. McQuillen also reported that Nagy felt "worn out" by the end of the day.  *Id.*  Nagy saw Dr. Montoya approximately two weeks later on August 19, 2011, where Dr. Montoya noted that Nagy had "missed very few days of work (only one day recently)" but that Nagy's job had changed to a more stressful position within Oracle and that his work hours were very uneven.  AR 2105.  Dr. Montoya listed Nagy's "His physical" percentage at 60-70% and his "Cognitive" at 60%.  *Id.*

## 2.  Nagy Applies for Short Term Disability and Leaves Oracle

On September 12, 2011, Nagy visited Dr. Duggal complaining of tearfulness, insomnia, frequent awakening, trouble falling asleep, decreased concentration, fatigue, decreased motivation, dizziness and anxiety.  AR 2359.  Nagy stated that he was "dreading work and more anxious or fearful of his health issues," although he was "not feeling as much dread as he was before - when he was first started on antidepressant meds several yrs. ago."  *Id.*  Nagy further reported that he "has been dizzy and is dreading going back to work . . . feels he needs some more recuperation time . . . feels he cannot do his job . . . feels terrible at work [because] of his physical [symptoms]."  *Id.*  Nagy stopped working the next day and applied for short term disability.  Dr. Duggal filled out an "Attending Physician's Statement of Work Capacity and Impairment" form on September 22, 2011.  AR 156-57.  In that form, Dr. Duggal described her rationale for

recommending disability leave by stating:

> David has significant anxiety/depression related to his health situation including dizziness and lightheadedness.  He is being [illegible] for this by other MD's.  He has poor concentration/focus/motivation and cannot perform his job duties.  He continues to have insomnia and depressed moods.

AR 156.  Dr. Duggal described Nagy's symptoms as "cannot focus, concentrate, sleep at night.  Frequently anxious and has depressed moods."  AR 157.  Dr. Duggal listed "depressed mood and agitation" under "Physical Examination Findings."  Her handwriting is illegible beneath the section of the form titled "Diagnostic Test/Study Findings."  *Id*.  She checked the "Yes" box in response to the question "Do you currently consider your patient to be totally impaired from working" with a beginning impairment date of September 8, 2011.  *Id*.  Dr. Duggal listed Nagy's estimated date of return to full duty work as exactly one month later:  October 22, 2011.  *Id*.

Dr. Zei also completed the "Attending Physician's Statement of Work Capacity and Impairment" form, which he dated September 23, 2011.  Although the administrative record appears to contain only the second page of that document, Dr. Zei stated that Nagy "continues to have lightheadedness, [illegible] and ringing in the ears and persistent fatigue."  AR 176.  Dr. Zei checked the "No" box in response to the question "Can your patient return to work full time with no work restrictions" and noted that Nagy would be re-assessed on February 22, 2012.  *Id*.  Dr. Zei also checked the "No" box in response to the question "Do you expect the patient will have permanent work restrictions?"  *Id*.

Dr. Montoya filled out the same form in October of 2011.  AR 151-52.  Dr. Montoya described Nagy's symptoms as "lightheadedness, abdominal pain, diarrhea, dizziness, post-exertional malaise, sweating, tinnitus."  AR 152.  Dr. Montoya listed "fever, lightheadedness" under "Physical Examination Findings" and what appear to be a series of test results under "Diagnostic Test/Study Findings."  *Id*.  He checked the "Yes" box in response to the question "Do you currently consider your patient to be totally impaired from working" with a beginning impairment date of August 19, 2011 (the date of Nagy's last visit).  *Id*.  Dr. Montoya did not respond to the question asking for medical facts documenting Nagy's functional impairments.  *Id*.  Dr. Montoya inserted the date February 22, 2012, in response to the prompt "I anticipate

United States District Court
Northern District of California

significant clinical improvement in my patient's functional capacity by the following date." *Id.* February 22, 2012, was the date of Nagy's next scheduled visit to see Dr. Montoya. AR 151.

Nagy saw Dr. Duggal again on October 6, 2011, and she again noted symptoms of tearfulness, moodiness, fatigue, decreased concentration/focus, decreased motivation, insomnia and frequent awakening. AR 2367. Dr. Duggal noted that Nagy would "stay off work for another 2 weeks" and strongly encouraged him to see a counselor. AR 2368. On October 24, 2011, Nagy saw Dr. Duggal again complaining of the same general symptoms, and Dr. Duggal reported that he "does not feel he is able to return to work yet . . . doesn't feel he could be productive." AR 1932. Nagy's November 4, 2011, visit with Dr. Duggal showed some improvement in that Nagy's "moods are more stable . . . motivation and concentration." AR 1934. Dr. Duggal also recorded that Nagy "does not feel like he can return to work here - does not feel he is ready for this." *Id.*

On November 18, 2011, Dr. Zei saw Nagy during a clinic visit and stated that he was "quite debilitated with an unclear medical condition manifest as chronic lightheadedness and blood pressure instability, fatigue, with a running diagnosis of potentially autonomic dysfunction, perhaps associated with a syndrome of chronic fatigue syndrome." AR 2109. Dr. Zei further noted that Nagy is "doing about the same" and that he "is extremely debilitated by these symptoms." AR 2110.

### 3. Nagy Moves to Georgia and Applies for Long Term Disability

On November 4, 2011, Nagy informed Dr. Duggal that he would be relocating to Georgia in the next few months. AR 1934. Once in Georgia, Nagy began treatment with William Early, M.D., who he saw approximately once per month beginning in January 27, 2012. Dr. Early's treatment notes differ significantly from those of Nagy's doctors in California. For example, on January 27, 2012, Dr. Early's notes reflect that Nagy was "feeling well" and listed the following symptoms as "not present:" fatigue, headache, visual disturbances, hearing loss, decreased memory, dizziness, and headaches (among others). AR 2169. Dr. Early did record Nagy as presenting with abdominal pain, diarrhea, reflux, anxiety, depression, insomnia, and "note: autonomic nervous system disorder." *Id.* Dr. Early noted that "malaise and fatigue" were "not present" during Nagy's February 21, 2012 visit, AR 2167, and noted that fatigue, dizziness,

decreased memory, anxiety and depression were "not present" during Nagy's March 20, 2012, April 12, 2012, and April 26, 2012 visits, AR 2146, 2152, 2159.

On April 24, 2012, Nagy met with Nurse Tarra Corbett.  AR 2149.  Nurse Corbett recorded that Nagy was using "Cpap" and was "[n]o longer dizzy with position changes."  *Id.* While she wrote that Nagy complained of "a constant ringing in [ears]-lightheaded feeling," she also noted that the "[s]ymptom is improving."  *Id*.  Although it is unclear what testing, if any, Nurse Corbett conducted during that visit, she reported that Nagy had "no impairment of attention, impairment of concentration, impairment of long term memory or impairment of short term memory."  AR 2150.  Nagy saw Nurse Corbett again on July 24, 2012, for a three-month follow-up, and she recorded that Nagy complained of being "'lightheaded' a lot" and that "he has been disabled due to the dizzy, lightheaded feeling since 2006."  AR 1917.  Dr. Early saw Nagy one week later on July 31, 2012, and he again recorded that fatigue, dizziness, decreased memory, anxiety and depression were "not present."  AR 1913-14.

On July 10 and 30, 2012, Hartford sent Nagy letters informing him of his possible eligibility for LTD benefits.  AR 84-85.  On August 22, 2012, Nagy saw Dr. Early and asked him to fill out his LTD forms.  AR 1910.  At this visit, Dr. Early recorded malaise, fatigue, tiredness, dizziness, easily distracted and depressive symptoms, abdominal pain and diarrhea as "present" symptoms.  AR 1911.  Dr. Early also completed an "Attending Physician's Statement of Work Capacity and Impairment" form the same day.  AR 282-83. He described his rationale for recommending disability leave by stating that Nagy "has abdominal pain, diarrhea, dizziness, tinnitus, lightheadedness and exertional malaise."  AR 282.  He checked the "Yes" box in response to the question "Do you currently consider your patient to be totally impaired from working" with a beginning impairment date of January 27, 2012.  AR 283.  Dr. Early explained his rationale by stating that "with physical activity, [Nagy] has extreme lightheadedness, diarrhea, malaise, fatigue."  *Id*.  Dr. Early also responded "Yes" to the question "Do you anticipate, or currently recommend, permanent work restrictions?"  *Id*.

Nagy was then referred by his neurologist, Scott Cooper, M.D., for a neuropsychological assessment of his current level of function, which took place on September 26 and October 29,

2012.  AR 375-81.  The Neuropsychological Evaluation noted that Nagy was "cooperative and attended adequately throughout testing" and "appeared to provide good effort throughout the assessment."  AR 377.  Nagy's results were mixed.  Nagy scored in the superior range in a variety of measures.  For example, Nagy's intelligence and verbal ability were found to be in the 94th and 95th percentiles, respectively, while his perceptual reasoning was assessed in the high average range.  *Id*.  In contrast, "[t]ests of attention revealed an area of largely below average performance."  AR 378.  Nagy's performance on a test that measures "timed attention with visual scanning" was in the low average range in the 18th percentile.   *Id*.  A longer test of sustained visual attention revealed that his performance was "not within normal limits" and suggested an attention disorder.  *Id*.

Testing of Nagy's visual memory revealed a similar dichotomy.  Nagy's initial recall was in the 99th percentile, as was his ability to learn over five consecutive trials.  AR 378.  Nagy's performances on "inference task" and "free recall" tests were all 84th percentile or above.  *Id*.  However, across the overall test, "Nagy exhibited 14 repetition errors, which placed him in the impaired range at the 1st percentile and indicated difficulties with executive self-monitoring."  *Id*.  Nagy also "exhibited difficulties in self-monitoring of errors on the verbal memory task in which he made an impaired number of repetition errors.  He also demonstrated inefficient use of known memory strategies on the task, corroborating possible deficits in meta-cognition."  AR 379.  In the summary of conclusions, the report observed that:

> Mr. Nagy appeared to have numerous cognitive strengths on neuropsychological testing, including above average intelligence, superior memory abilities, and generally average executive functioning.  He exhibited difficulty with sustained attention and self-monitoring of errors, as well as some problems with short attention and meta-cognition (thinking about his thinking or utilizing effective cognitive strategies).

AR 380.  The report suggested that "several factors could have distracted Nagy from performing at his best on tests measuring attention, such as: discomfort from physical symptoms, impoverished sleep, and emotional distress."  *Id*.

On January 31, 2013, Dr. Early completed a "Health Care Provider Certification for a Medical Leave of Absence."  AR 373.  Dr. Early listed the dates of absence as September 8, 2011,

through "current" and the expected return to work date as "unknown." *Id.* Under the heading "Medical Facts," Dr. Early explained that Nagy had "decreased short term memory/cognition and lightheadedness with decreased ability to [illegible] sees neurologist every 2-3 weeks." *Id.*

### D. Hartford's Medical Evidence

Hartford ordered four independent medical reviews of Nagy's file during the course of his LTD claim and appeal. Those reviews were conducted by Brian McCrary, D.O., Ben Hur P. Mobo, M.D., M.Ph., Sharon F. Welbel, M.D., and Karen D. Sullivan, Ph.D. Dr. McCrary, who is board-certified in Occupational Medicine and Aerospace Medicine, and Dr. Mobo, who is board-certified in Internal Medicine, reviewed Nagy's file with respect to Nagy's autonomic disorder, irritable bowel syndrome, lightheadedness, and other non-CFS or cognitive related problems. Dkt. No. 51 at 8. Dr. Welbel, who is board certified in Internal Medicine and Infectious Diseases, reviewed Nagy's file with respect to his CFS. *Id.* at 9. Dr. Sullivan, board certified in Clinical Neuropsychology, reviewed the file to opine on Nagy's cognitive abilities. *Id.*

#### 1. Dr. McCrary's File Review

Dr. McCrary reviewed Nagy's file and issued a 7-page report on January 15, 2013. AR 1888-94. After reviewing Nagy's medical records and speaking to Dr. Early,[1] Dr. McCrary found that "[t]here is no objective evidence of any condition requiring restrictions or limitations. The claimant has had chronic subjective symptoms which wax and wane and did not significantly impact his ability to work previously." AR 1892. Dr. McCrary further concluded that Nagy's subjective complaints of lightheadedness and fatigue were not medically supported because Nagy "has long-term chronic subjective symptoms without objective findings or only very minimal objective findings despite extensive and repeated testing and examinations." AR 1893. Dr. McCrary's report does not disclose what objective findings he would expect to see for a patient suffering from Nagy's claimed symptoms.

#### 2. Dr. Mobo's File Review

Dr. Mobo reviewed Nagy's file and issued a thirteen-page report on November 11, 2013.

---

[1] Dr. McCrary attempted to speak with Dr. Montoya and Dr. Duggal but was not successful. AR 1891.

United States District Court
Northern District of California

AR 90-102.  After reviewing Nagy's medical records and discussing Nagy's symptoms and treatment with Dr. Zei and Dr. Early, Dr. Mobo found that there was no support for "impairment related to orthostatis and tachycardia (from the reported POTS) from a cardiovascular, ENT, endocrine, and neurologic standpoint from 09/13/2011 through to the present."  AR 98. Specifically, Dr. Mobo noted that cardiac work-ups, "including exercise tests, nuclear medicine exercise stress test, Holter monitor, various EKGs and an echocardiogram have not documented cardiac impairment."  AR 99.

On October 24, 2013, Dr. Mobo spoke with Dr. Zei, who "expressed an updated opinion that from a cardiovascular perspective, the claimant does not have a documented cardiovascular condition that warrants restrictions or limitations."  AR 97.  Dr. Mobo spoke with Dr. Early on October 29, 2013.  *Id*.  During their phone conversation, Dr. Early "clarified that the 30 days of incapacity [referenced in Nagy's file] is based on the claimant's subjective/self-reported reports." *Id*.  According to Dr. Mobo, Dr. Early further noted that "he has not documented specific orthostasis or significant objective/clinical findings since taking care of the claimant's health care [and that] the obstructive sleep apnea and the restless leg syndrome are under good clinical control."  *Id*.  Dr. Mobo represented that these conversations confirmed his conclusion concerning the absence of restrictions and limitations.  AR 100.

### 3.  Dr. Welbel's File Review

Dr. Welbel reviewed Nagy's file and issued an eight-page report on November 11, 2013. AR 102-08.  In that report, Dr. Welbel quoted the CDC's definition of CFS, which requires the observation of four or more the following eight symptoms:

> (1) post-exertional malaise lasting more than 24 hours; (2) un-refreshing sleep; (3) significant impairment in short-term memory or concentration; (4) muscle pain; (5) multi-joint pain without swelling or redness; (6) sore throat; (7) tender lymph nodes; (8) headaches of a new type, pattern, or severity.

AR 106.  Dr. Welbel noted that Nagy largely complained of the following symptoms: "dizziness, excessive sweating, and fatigue," but not of "memory problems, muscle or joint pain, sore throat, or tender lymph nodes."  *Id*.  Accordingly, Dr. Welbel concluded that, "[b]ased on the medical records provided, the claimant's condition has not changed significantly from 09/13/2011 to the

United States District Court
Northern District of California

present.  His documented physical examinations, laboratory tests, and other testing are largely noted to be normal and noted above . . . .  There is no significant evidence of chronic fatigue syndrome, and therefore no restrictions and limitations are supported based on this diagnosis."  AR 107.  Dr. Welbel's report did not disclose what results from "physical examinations, laboratory tests, and other testing" could support a finding of CFS.[2]

### 4.  Dr. Sullivan's File Review

Dr. Sullivan reviewed Nagy's file and issued a seven-page report on November 11, 2013.  AR 109-14.  After reviewing Nagy's medical records,[3] Dr. Sullivan concluded that "[t]here is no evidence in the medical records provided of a cognitive disorder or functional restrictions or limitations due to a psychiatric disorder," although she observed that there is evidence to support mild symptoms of anxiety related to chronic medical complaints.  AR 113.  Dr. Sullivan questioned the "one possible notable finding of fluctuating attention" in Nagy's neuropsychological assessment "due to the lack of gold-standard effort measures."  *Id*.  While Dr. Sullivan conceded that the provider "administered several embedded measures, which were noted to be intact," she opined that the validity of the overall evaluation was reduced by the use of "one antiquated stand-alone measure [of effort]."  *Id*.

### E.  Nagy's Statement

In his appeal of Hartford's initial denial of disability benefits, Nagy submitted a narrative statement to Hartford explaining the effect of his health on his daily life.  AR 190-91.  In that statement, Nagy represented that he can only be productive for one to three hours a day and generally spends the remainder of his time resting or sleeping.  AR 190.  Nagy can usually tolerate "a couple of hours of fairly mindless computer use before [he] start[s] feeling too woozy to continue."  *Id*.  Nagy gets "absolutely soaked in sweat after just a few minutes of activity."  *Id*.  In a three hour period, Nagy requires two or three bathroom breaks, which is actually an improvement from the five to seven bathroom breaks he required while working.  *Id*.  Although Nagy's main complaint remains a "constant lightheadedness [that] makes just about everything

United States District Court
Northern District of California

---

[2] Dr. Welbel attempted to speak with Dr. Early and Dr. Montoya but was not successful.  AR 107.
[3] Dr. Sullivan attempted to speak with Dr. Early and Dr. Duggal but was not successful.  AR 111.

more difficult and unpleasant[,]" his problems with temperature control have become more of a burden since he stopped working. *Id.* at 191. Nagy explained that he simply does not "do anything intellectual anymore, so being perpetually woozy all the time is not the impediment it once was." *Id.* Nagy conceded that the "little stuff" like the ringing in his ears and his stomach problems are relatively "minor nuisances." *Id.*

### F.   Dr. Montoya's Declaration

On February 5, 2015, Nagy moved the Court to permit the late filing of a declaration by Dr. Montoya on the ground that Hartford did not inform him of its medical consultants' unsuccessful attempts to contact Dr. Montoya during the administrative proceedings. *See* Dkt. No. 54 at 1 ("If a claims administrator communicates with a doctor who has treated a beneficiary, it must disclose that fact to the patient at a meaningful time.") (quoting *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 873, n.4 (9th Cir. 2008)). Communicating this information permits the claimant "to urge [the doctor] to timely respond or ask [the provider] to extend the deadline." *Saffon*, 522 F.3d at 873, n.4. There is no dispute that Hartford failed to give Nagy notice that its consultants had unsuccessfully tried to contact Dr. Montoya on numerous occasions during the administrative proceedings. Thus, the Court will consider Dr. Montoya's declaration to "in essence, recreate what the administrative record would have been had the procedure been correct." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 973 (9th Cir. 2006).

In his declaration, Dr. Montoya stated that Nagy first visited his clinic on May 30, 2008, complaining of a history of light-headedness that became severe (including "seeing stars"), ringing in his ears, and sweating. Dkt. No 54 at 20. He observed that Nagy had developed significant fatigue and that it "became very difficult for [Nagy] to concentrate (brain fog)." *Id.* In addition, Dr. Montoya stated that Nagy experienced sore throats, tender and enlarged lymph nodes, unrefreshing sleep, and new headaches. *Id.* While Nagy denied myalgias, arthralgias, and postexertional malaise "back then," Dr. Montoya "always questioned his denial [of] postexertional malaise since he did not take into account the fact that he will get progressively more fatigue[d] as his regular week went on." *Id.* Based on these observations, Dr. Montoya opined that Nagy "perfectly fit the definition of CFS by Fukuda." *Id.* Dr. Montoya did not further opine on whether

1  Nagy's CFS precludes him from working.

2  **G.   The Social Security Administration's Determination**

3  On April 17, 2015, Nagy moved the Court for leave to submit the Social Security

4  Administration's January 28, 2015, decision granting Nagy disability insurance benefits, Dkt. No.

5  71-1 ("SSA Decision").  *See* Dkt. No. 66.

6  When a district court reviews an ERISA administrator's denial of benefits under the de

7  novo standard of review, "extrinsic evidence [may] be considered only under certain limited

8  circumstances."  *Opeta v. Northwest Airlines Pension Plan for Contract Employees*, 484 F.3d

9  1217 (9th Cir. 2007) (citation omitted).  The district court should "exercise its discretion to

10 consider evidence outside the administrative record only when circumstances *clearly establish* that

11 additional evidence is *necessary* to conduct an adequate de novo review of the benefit decision."

12 *Id*. (citation and quotation marks omitted).  The Ninth Circuit has adopted the Fourth Circuit's

13 non-exhaustive list of exceptional circumstances where the introduction of evidence beyond the

14 administrative record *could be* considered necessary:

15         claims that require consideration of complex medical questions or
16         issues regarding the credibility of medical experts; the availability of
        very limited administrative review procedures with little or no
17         evidentiary record; the necessity of evidence regarding interpretation
        of the terms of the plan rather than specific historical facts; instances
18         where the payor and the administrator are the same entity and the
        court is concerned about impartiality; claims which would have been
19         insurance contract claims prior to ERISA; and circumstances in
        which there is additional evidence that the claimant could not have
20         presented         in        the        administrative         process.

21 *Id*. (citation omitted).  However, the fact that a case implicates even several of these circumstances

22 does not automatically justify the admission of extrinsic evidence.  The Court must still find that

23 the presence of these circumstances renders consideration of the particular extrinsic evidence

24 necessary to conduct de novo review of the benefit decision.  *Id*.

25 The Court finds that several of the aforementioned exceptional circumstances are present

26 here.  Nagy's claims involve complex medical questions, the parties dispute the credibility of both

27 Nagy's treating physicians and Hartford's medical experts, and Nagy could not have presented the

28 SSA Decision during the administrative process because it was not issued until January 28, 2015,

United States District Court
Northern District of California

1   over a year after Hartford had denied Nagy's appeal.

2        Further, the SSA Decision is necessary to conduct an adequate de novo review of Nagy's

3   claims.  CFS is a complicated medical condition, for which there are no objective tests and for

4   which a diagnosis depends in large part on the patient's self-reported symptoms.  *See Salomaa v.*

5   *Honda Long Term Disability Plan,* 642 F.3d 666, 677 (9th Cir. 2011).  Thus, the Court is faced

6   with an unavoidable credibility dispute between the ERISA beneficiary and his treating physicians

7   on one hand, and the insurer's medical experts on the other, without having heard testimony from

8   the individuals whose credibility is being questioned.  In a situation such as this one, where the

9   Court's holding inevitably relies on a credibility determination, and an administrative law judge

10  ("ALJ") has heard testimony from the claimant, evaluated the medical record, and made a well-

11  reasoned disability determination, the ALJ's decision is probative of Nagy's disability at the time

12  he applied for LTD benefits.  Accordingly, while the SSA Decision is not binding, the Court will

13  consider Nagy's SSA Decision in evaluating whether Nagy was disabled under the terms of the

14  Policy.  *See Schramm v. CNA Fin. Corp. Insured Grp. Ben. Program*, 718 F. Supp. 2d 1151, 1165

15  (N.D. Cal. 2010) (considering extrinsic award of SSDI benefits); *Oldoerp v. Wells Fargo &*

16  *Company Long Term Disability Plan*, No. C 08-05278 RS, 2013 WL 6000587, at *3 (N.D. Cal.

17  Nov. 12, 2013) (same).

18       Nagy's claim for disability benefits from the Social Security Administration underwent

19  three different reviews.  His claim was initially rejected on April 13, 2013, and was rejected again

20  on July 12, 2013.  The third level of review determined Nagy to be disabled from working in his

21  occupation (as opposed to "any" occupation).  SSA Decision at 9.

22       The ALJ assigned to Nagy's third-level review found that Nagy had the following "severe"

23  impairments: "postural orthostatic tachycardia syndrome (POTS), chronic fatigue syndrome,

24  obstructive sleep apnea (OSA), and adjustment disorder."  *Id*. at 3.  After considering Nagy's

25  medical records and in-person testimony, the ALJ concluded that Nagy's "medically determinable

26  impairments could reasonably be expected to cause the alleged symptoms; however, the

27  claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms

28  are not entirely credible for the reasons explained in this decision."  *Id*. at 6.  For example, the ALJ

United States District Court
Northern District of California

United States District Court
Northern District of California

1  noted that Nagy was still working full-time and no longer missing days of work in November

2  2010 and continued working full time through at least August 2011, years after he began

3  experiencing symptoms.  *Id*.  The ALJ also noted that Nagy was able to walk nine miles for

4  exercise every weekend—and even felt better when he exercised—as of June 2011.  *Id*. at 6-7.

5  Based on these symptoms, the ALJ found that Nagy "has impairments that cause

6  significant limitations, but considering treating and examining source opinions, [the] limitations

7  are not of a severity to preclude ability to meet demands of basic work activities and not contrary

8  to a finding the claimant has the residual functional capacity for work at the [sedentary] level

9  assigned."  *Id*. at 8.  However, the ALJ agreed with the vocational expert and further found that,

10  despite being able to perform sedentary-level jobs, Nagy had been unable to perform his past

11  relevant work as a software engineer since September 8, 2011.  *Id*.  Although the ALJ noted that

12  his conclusion would require a finding of "not disabled" under normal circumstances, Nagy's

13  "advanced age" beginning in February 2012 (when he turned 50) entitled him to SSDI benefits

14  because he could no longer be expected to transfer his job skills to another occupation.  *Id*. at 8-9.

## II.    LEGAL STANDARD

16  The Employment Retirement Income Security Act ("ERISA") provides claimants with a

17  federal cause of action to recover benefits due under an ERISA plan.  29 U.S.C. § 1132(a)(1)(B).

18  When confronted with disputed issues of material fact, "the Court must conduct, pursuant to Rule

19  52, Federal Rules of Civil Procedure, a bench trial based on the administrative record and such

20  other evidence as the Court admits."  *Sabatino v. Liberty Life Assurance Co. of Boston*, 286 F.

21  Supp. 2d 1222, 1229 (N.D. Cal. 2003) (citing *Kearney v. Standard Ins. Co.,* 175 F.3d 1084, 1094–

22  95 (9th Cir.) (en banc) *cert. den.* 528 U.S. 964, 120 S.Ct. 398 (1999)).

23  A denial of ERISA benefits "is to be reviewed under a de novo standard unless the benefit

24  plan gives the administrator or fiduciary discretionary authority to determine eligibility for

25  benefits or to construe the terms of the plan."  *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S.

26  101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *see also Abatie v. Alta Health & Life Ins. Co.,*

27  458 F.3d 955, 963 (9th Cir.2006) (en banc) ("De novo is the default standard of review.").  "To

28  assess the applicable standard of review, the starting point is the wording of the plan."  *Abatie,* 458

1    F.3d at 962-63.

2          However, the Court does not reach the question of whether the plan afforded such

3    discretion to Hartford because any provision to that effect would be void under California law.

4    California Insurance Code § 10110.6 provides in relevant part:

> (a)   If a policy, contract, certificate, or agreement offered, issued,
> delivered, or renewed, whether or not in California, that
> provides or funds life insurance or disability insurance
> coverage for any California resident contains a provision that
> reserves discretionary authority to the insurer, or an agent of
> the insurer, to determine eligibility for benefits or coverage,
> to interpret the terms of the policy, contract, certificate, or
> agreement, or to provide standards of interpretation or
> review that are inconsistent with the laws of this state, that
> provision is void and unenforceable.
>
> (b)   For purposes of this section, "renewed" means continued in
> force on or after the policy's anniversary date.
>
> (c)   For purposes of this section, the term "discretionary
> authority" means a policy provision that has the effect of
> conferring discretion on an insurer or other claim
> administrator to determine entitlement to benefits or interpret
> policy language that, in turn, could lead to a deferential
> standard of review by any reviewing court.
>
> . . .
>
> (g)   This section is self-executing. If a life insurance or disability
> insurance policy, contract, certificate, or agreement contains
> a provision rendered void and unenforceable by this section,
> the parties to the policy, contract, certificate, or agreement
> and the courts shall treat that provision as void and
> unenforceable.

20   Cal. Ins. Code § 10110.6.  Section 10110.6 became effective January 1, 2012, *id.*, and Nagy's

21   claim was denied in January 2013, well after that date.  *See Grosz-Salomon v. Paul Revere Life*

22   *Insurance*, 237 F.3d 1154, 1159 (9th Cir. 2001) (ERISA cause of action based on denial of

23   benefits accrues at the time the benefits are denied).

24         Hartford argues that Section 10110.6 is inapplicable because it applies only to

25   discretionary clauses that are "policy provisions," and that the discretionary clause at issue here is

26   found in the Plan itself, not in the policy of insurance.  Hartford directs this Court to *Orzechowski*

27   *v. Boeing Co. Non-Union Long-Term Disability Plan*, 2014 WL 979191 (C.D. Cal. March 12,

28   2014), which made such a distinction and found that a discretionary clause found in an ERISA

16

United States District Court
Northern District of California

1   Plan is not rendered unenforceable by Section 10110.6.

2          The Court is not persuaded.  This same argument has been rejected in numerous other

3   cases.  *See Rapolla v. Waste Management Employee Benefits Plan*, 2014 WL 2918863, at * (N.D.

4   Cal. June 25, 2014) (explaining that holding that Section 10110.6 does not apply to discretionary

5   clauses located in ERISA plans "would render section 10110.6 'practically meaningless,' as

6   'ERISA plans could grant discretionary authority to determine eligibility under an insurance

7   policy, so long as the grants were set forth somewhere other than in the insurance policy.'")

8   (citation omitted); *Gonda v. The Permanente Medical Group, Inc.*, 10 F. Supp. 3d 1091 (N.D. Cal.

9   2014); *Polnicky v. Liberty Life Assurance Co. of Boston*, 999 F. Supp. 2d 1144, 1149 (N.D. Cal.

10  2013).  During the bench trial, Hartford conceded that the ERISA Plan and the insurance policy

11  are a single composite agreement, and acknowledged that the weight of authority cuts against its

12  position.  Hartford cannot sidestep California's clear prohibition on discretionary clauses simply

13  because it placed that clause in a document that is incorporated by reference into a policy where

14  such a provision is void.

15         Accordingly, the Court will review Hartford's denial of benefits under the de novo

16  standard.  A court employing de novo review in an ERISA case "simply proceeds to evaluate

17  whether the plan administrator correctly or incorrectly denied benefits."  *Abatie,* 458 F.3d at 963.

18  "[T]he court does not give deference to the claim administrator's decision, but rather determines in

19  the first instance if the claimant has adequately established that he or she is disabled under the

20  terms of the plan."  *Muniz v. Amec Const. Mgmt., Inc.*, 623 F.3d 1290, 1295-96 (9th Cir. 2010).

21  The burden of proof "is placed on the claimant."  *Id.* at 1294.  In order to prove an entitlement to

22  LTD benefits, the claimant must do more than simply demonstrate a diagnosis of a disease or

23  condition that could prevent a patient from working.  The claimant must show that, whether

24  diagnosed or not, his or her injury or sickness is disabling.  *See Jordan v. Northrop Grumman*

25  *Corp. Welfare Benefit Plan*, 370 F.3d 869, 880 (9th Cir. 2004) ("That a person has a true medical

26  diagnosis does not by itself establish disability. Medical treatises list medical conditions from

27  amblyopia to zoolognia that do not necessarily prevent people from working."), *overruled on*

28  *other grounds by Abatie*, 458 F.3d at 968.

### III.    ANALYSIS

Employees who claim they are disabled by the symptoms of CFS present legitimate difficulties for ERISA plan administrators.  "There is no blood test or other objective laboratory test for chronic fatigue syndrome."  *Salomaa,* 642 F.3d at 676.  Instead, "[t]he standard diagnosis technique for [CFS] includes testing, comparing symptoms to a detailed Centers for Disease Control list of symptoms, excluding other possible disorders, and reviewing thoroughly the patient's medical history."  *Id.*  The inability of medical professionals to diagnosis CFS based on objective test results and their necessary reliance on the patient's self-reported symptoms leaves plan administrators rightfully concerned with false claims.  As the Ninth Circuit explained in *Salomaa*:

> One can understand the frustration of disability plan administrators with claims based on such diseases as chronic fatigue syndrome and fibromyalgia.  Absence of objective proof through x-rays or blood tests of the existence or nonexistence of the disease creates a risk of false claims.  Claimants have an incentive to claim symptoms of a disease they do not have in order to obtain undeserved disability benefits.

*Id*. at 678.  For example, a CFS diagnosis is based in part on the presence of at least four of eight criteria adopted by the Center for Disease Control:  post-exertional malaise, un-refreshing sleep, significant impairment in short-term memory or concentration, muscle pain, multi-joint pain without swelling or redness, sore throat, tender lymph nodes, and new headaches.  AR 106; Dkt. No. 54 at 20-23.  Many of these criteria, such as un-refreshing sleep and muscle/joint pain, are difficult if not impossible for plan administrators to verify.

Of course, the absence of objective test results and observable symptoms present equally frustrating challenges for employees who actually suffer from debilitating CFS symptoms.  In order to receive benefits under an ERISA plan, employees must "prove" their disability to skeptical plan administrators without the benefit of objective evidence — an already difficult task exacerbated by the fact that plan administrators have a financial incentive to deny employee claims.  As the court in *Salomaa* also recognized, "the claimants are not the only ones with an incentive to cheat.  The plan with a conflict of interests also has a financial incentive to cheat. Failing to pay out money owed based on a false statement of reasons for denying is cheating,

1  every bit as much as making a false claim." *Salomaa,* 642 F.3d at 678.  Accordingly, the Ninth

2  Circuit has held that "the lack of objective physical findings" is insufficient to justify denial of

3  disability benefits.  *Id.* at 669; s*ee also Benecke v. Barnhart,* 379 F.3d 587, 590 (9th Cir. 2004).

4  "[A] disability insurer [cannot] condition coverage on proof by objective indicators such as blood

5  tests where the condition is recognized yet no such proof is possible." *Salomaa,* 642 F.3d at 678.

6         This complicated dynamic clearly exists here.  While this is a close case, the Court finds

7  that the totality of the evidence supports a finding that Nagy was experiencing "Total Disability"

8  as defined under the Policy from September 13, 2011, until Hartford denied his claim on January

9  16, 2013.

10     **A.     Nagy's Condition between September 8, 2011, and January 27, 2012**

11         The record contains substantial evidence that Nagy was disabled under the Policy prior to

12  his move to Georgia in late 2011 or early 2012.  Each of Nagy's treating physicians prior to his

13  move to Georgia found Nagy "totally disabled" from returning to his job at Oracle.  For example,

14  Nagy began receiving care for CFS from Dr. Montoya on June 4, 2008.  AR 2028-29.  Nagy's

15  symptoms began to improve under Dr. Montoya's care, until on September 12, 2011, Nagy

16  presented to Dr. Duggal complaining of tearfulness, insomnia, frequent awakening, trouble falling

17  asleep, decreased concentration, fatigue, decreased motivation, dizziness, and anxiety.  AR 2359.

18  After observing Nagy, Dr. Duggal filled out an "Attending Physician's Statement of Work

19  Capacity and Impairment" in which she explicitly stated that Nagy was "totally impaired from

20  working" since September 8, 2011.  AR 157.  Dr. Duggal estimated that Nagy would return to

21  work on October 22, 2011.  *Id.*  Dr. Duggal's disability determination is supported by physician

22  statements from Dr. Zei on September 23, 2011, and Dr. Montoya in October 2011.  Both Dr. Zei

23  and Dr. Montoya concurred that Nagy either could not return to work full time, AR 176, or had

24  been "totally impaired from working" since August 19, 2011,  AR 152.  They both expected to

25  reassess Nagy on February 22, 2012.  *Id.*; AR 176.  While Dr. Duggal expected Nagy to return to

26  work on or around October 22, 2011, Nagy visited Dr. Duggal on October 6, 2011, and November

27  4, 2011, presenting with similar disabling symptoms despite some improvement in mood,

28  motivation, and concentration.  AR 2368, 1932, 1934.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Given the concurrence of Nagy's treating physicians, Nagy has established that he was

2    disabled from returning to his previous work at Oracle during this period.  Two of Nagy's treating

3    physicians expected his condition to continue until at least February 22, 2012, and as such, the

4    Court finds that Nagy was disabled between September 8, 2011, and at least his first appointment

5    with Dr. Early in Georgia on January 27, 2012.[4]

6    **B.    Nagy's Condition Beginning on January 27, 2012**

7    As soon as Nagy arrived in Georgia, the record of his disability became more equivocal.

8    Between January 27, 2012, and April 26, 2012, Nagy visited Dr. Early five times.  AR 2146, 2152,

9    2159, 2169, and 2167.  Dr. Early's notes from each of these visits indicate a marked improvement

10   in Nagy's symptoms.  *Id.*  By March 2012, Nagy was no longer experiencing fatigue, dizziness,

11   decreased memory, anxiety, or depression.  AR 2146, 2152, 2159.  Both of Nagy's medical

12   providers in Georgia, Dr. Early and Nurse Tarra Corbett, noted improvement in Nagy's overall

13   condition, though Nagy consistently experienced ringing in his hears and a feeling of

14   lightheadedness.  AR 1913-14, 1917, 2149, 2150.  Nagy's condition did not take a turn for the

15   worse until August 22, 2012, after Hartford sent him letters of his potential eligibility for LTD

16   benefits on July 10 and July 21, 2012.  AR 84-84, 1910.  At Nagy's August 22, 2012,

17   appointment, he asked Dr. Early to fill out his LTD forms and reported, malaise, fatigue, tiredness,

18   dizziness, easily distracted and depressive symptoms, abdominal pain, and diarrhea.  AR 1911.

19   Understandably, Hartford places significant emphasis on the seemingly convenient timing of

20   Nagy's health downturn.  Hartford Br. at 10-11.

21   _____

22   [4] Nagy argues that any determination contrary to the California Unemployment Insurance Board's
finding that Nagy was disabled between September 8, 2011, and January 1, 2012, is barred by the

23   doctrine of collateral estoppel.  Nagy Br. at 2-6.  "California accords an administrative proceeding
preclusive effect if: (1) the administrative hearing provided the party against whom it is being used

24   a full and fair opportunity to litigate its case; (2) the traditional requirements of collateral estoppel
are met; and (3) according preclusive effect comports with the public policy goals of the doctrine

25   of collateral estoppel."  *Collier v. Reliastar Life Ins. Co.*, 589 F. App'x 821, 823 (9th Cir. 2014),

26   *cert. denied*, 135 S. Ct. 1748 (2015) (citing *People v. Garcia,* 39 Cal.4th 1070 (2006)).  However,
Hartford was not involved in the hearing before the California Unemployment Insurance Board,

27   and thus did not have a full and fair opportunity to litigate this question.  *See* Dkt. No. 47-7.
Accordingly, collateral estoppel does not apply.

28

United States District Court
Northern District of California

However, the Court's concern about the timing of Nagy's complaints is tempered by other evidence in the administrative record, including (1) the SSA Decision finding that Nagy is disabled from returning to his prior Oracle employment and (2) Dr. Early's representations that Nagy has been disabled since he first began caring for him on January 27, 2012.

### 1.  Social Security Administration Decision

On January 28, 2015, an ALJ evaluated Nagy's medical records, expert testimony, and Nagy's own testimony and found that Nagy has been unable to perform his prior job as an Oracle software engineer since September 8, 2011.  SSA Decision at 8.  The ALJ found that Nagy suffers from several "severe" impairments, including "postural orthostatic tachycardia syndrome (POTS), chronic fatigue syndrome, obstructive sleep apnea (OSA), and adjustment disorder."  *Id*. at 3.  The ALJ did not make this disability determination lightly — he scrutinized Nagy's demeanor and concluded that Nagy's statements "concerning the intensity, persistence, and limiting effects" of his symptoms were "not entirely credible."  Yet, even discounting Nagy's testimony for these reasons, the ALJ still found Nagy disabled.[5]  *Id.* at 6.

Given the ALJ's greater access to witness and expert testimony, the Court finds the ALJ's well-supported conclusion that Nagy could not return to his job at Oracle between September 8, 2011, and January 28, 2015, persuasive.

### 2.  Dr. Early's Opinion

Similarly, Dr. Early, Nagy's current primary physician, has also opined that Nagy cannot return to his work at Oracle.  Following Nagy's August 22, 2012, appointment, Dr. Early stated that Nagy has been "totally impaired from working" since January 27, 2012, and recommended permanent work restrictions.  AR 283.  Dr. Early attributed this finding to the fact that "with physical activity, [Nagy] has extreme lightheadedness, diarrhea, malaise, fatigue."  *Id.*  On January 31, 2013, Dr. Early completed a "Health Care Provider Certification for a Medical Leave of Absence" and explained that Nagy was experiencing "decreased short term memory/cognition and

---

[5] While the ALJ concluded that Nagy has the capacity to perform unskilled sedentary work, *id.* at 9, the Court's task here is to determine whether Nagy could return to his prior *skilled*, sedentary job as an Oracle software engineer.

lightheadedness with decreased ability to [illegible] sees neurologist every 2-3 weeks. *Id.*

The Court notes that these conclusions stand somewhat in contrast to Dr. Early's patient notes between January 27, 2012, and April 26, 2012. AR 2146, 2152, 2159, 2169, and 2167. Yet the Court cannot entirely disregard Dr. Early's conclusion that Nagy is disabled given that nothing in Dr. Early's prior patient notes explicitly contradicts his finding of disability. *See id.* Many diseases wax and wane over time, and periods of improvement do not necessarily indicate that a patient is cured. Indeed, Dr. Montoya warned Nagy that CFS patients "report that their level of functioning feels like a rollercoaster . . . . As soon as patients start to feel better, it is natural to want to increase their activity level; however this is not advisable during the initial recovery process because it will likely lead to a crash." AR 187. According to Dr. Montoya, even if a patient experiences improvement for 3-6 months, it is important that any increased levels of activity are introduced in "VERY small increments." AR 188. It is entirely possible that Nagy was experiencing just this rollercoaster pattern of symptoms between January 27, 2012, and August 22, 2012. Further, even assuming that Dr. Early admitted to Hartford's experts that he had found minimal abnormalities upon objective testing, "[t]here is no blood test or objective laboratory test for chronic fatigue syndrome." *Salomaa,* 642 F.3d at 677.

The Court attributes slightly less weight to Dr. Early's disability determination given the disparity between his comments from January 27, 2012, to April 26, 2012, and his comments on August 22, 2012, and January 31, 2013. But overall, the Court finds Dr. Early's opinion persuasive.

On balance, the totality of the evidence leads the Court to conclude that Nagy continued to be unable to return to his Oracle position through January 31, 2013.

### C.   Hartford's Evidence

The Court's finding is not undermined by Hartford's evidence that is less favorable to Nagy. As an initial matter, none of Hartford's four medical examiners personally examined Nagy; instead, each of the examiners based his or her conclusions upon a review of Nagy's medical records and, if available, phone discussions with Nagy's treating physicians. Accordingly, their reports lack the level of credibility normally attributed to physicians who have personally

1    observed a patient.  *See Rapolla v. Waste Mgmt. Employee Benefits Plan*, No. 13-CV-02860-JST,

2    2014 WL 2918863, at *8 (N.D. Cal. June 25, 2014) (finding that physician reports "lack a

3    satisfactory degree of credibility" because neither doctor personally examined the plaintiff and

4    based their conclusions entirely on review of the plaintiff's medical records); *Eisner v. The*

5    *Prudential Ins. Co. of Am.*, 10 F. Supp. 3d 1104, 1115 (N.D. Cal. 2014) ("Most importantly, as in

6    *Salomaa,* none of Prudential's consultants examined Plaintiff — although they could have. While

7    Prudential was not required to base its decision solely on the records from Plaintiff's treating

8    physicians, courts routinely weigh such records more heavily than they do reports and file reviews

9    from paid consultants who never examine the claimant or talk to the claimant's treating

10   physicians.").  Moreover, Dr. McCrary, Dr. Mobo, Dr. Welbel, and Dr. Sullivan all justified their

11   findings of no disability at least in part on a lack of objective evidence confirming Nagy's

12   condition.  AR 99, 107, 113, 1893.  Yet, as the Court has emphasized, no blood tests or objective

13   laboratory tests exist for CFS.  *See Salomaa,* 642 F.3d at 677.

14          Accordingly, the Court concludes that Nagy has been experiencing "Total Disability" as

15   defined under the Policy from September 13, 2011, until at least January 16, 2013, when Hartford

16   denied Nagy's LTD claim.

17          **D.    Attorney's Fees and Costs**

18          In the last sentence of his Rule 52 motion, Nagy requests attorney's fees and costs.  Nagy

19   Br. at 20.  "ERISA provides that 'the court in its discretion may allow a reasonable attorney's fee

20   and costs of action to either party.'"  *Smith v. CMTA-IAM Pension Trust*, 746 F.2d 587, 589 (9th

21   Cir. 1984) (citing § 502(g)(1), 29 U.S.C. § 1132(g)(1)).  The Ninth Circuit has held that "absent

22   special circumstances, a prevailing ERISA employee plaintiff should ordinarily receive attorney's

23   fees from the defendant."  *Id.* at 590.

24          However, Hartford did not brief the issue of attorney's fees and costs in its filings.

25   Accordingly, the Court reserves its ruling on fees and costs until the issue has been fully briefed.

26   Nagy may file an appropriate motion for attorney's fees under Civil Local Rule 54-5 within 14

27   days of the entry of judgment.

28

United States District Court
Northern District of California

**IV.    CONCLUSION**

The Court hereby OVERTURNS Hartford's denial of benefits and finds in favor of Nagy on both of the claims for relief in his complaint.  Within 30 days of the date of this Order, the parties shall (1) meet and confer to resolve the amount of disability benefits and prejudgment interest due to Nagy based on the findings and conclusion of this Order and (2) submit a proposed judgment consistent with this Order.

The Court will not address whether Nagy is disabled from "any occupation" under the Policy.  The Court ORDERS Hartford to determine whether Nagy is entitled to benefits under the "any occupation" standard, within 90 days of this Order.  *See Eisner v. The Prudential Ins. Co. of Am.*, 10 F. Supp. 3d 1104, 1117 (N.D. Cal. 2014); *Heinrich v. Prudential Ins. Co. of Am.*, No. C 04-02943 JF, 2005 WL 1868179, at *9 (N.D. Cal. July 29, 2005); *Allenby v. Westaff, Inc.*, No. C 04-2423 TEH, 2006 WL 3648655, at *9 (N.D. Cal. Dec. 12, 2006).

**IT IS SO ORDERED.**

Dated:  April 22, 2016

HAYWOOD S. GILLIAM, JR.
United States District Judge